**CHURCH OF SCIENTOLOGY OF CALIFORNIA, Appellant,**

**v.**

**INTERNAL REVENUE SERVICE, et al.**

**No. 83–1856.**

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Dec. 5, 1985.

Decided May 27, 1986.

As Amended May 27, 1986.

---

Robert A. Seefried, Washington, D.C., for appellant.

Jonathan Cohen, Atty., U.S. Dept. of Justice, of the Bar of the Supreme Court of Conn., pro hac vice, by special leave of the Court, with whom Glenn L. Archer, Jr., Asst. Atty. Gen., U.S. Dept. of Justice, Joseph E. diGenova, U.S. Atty., and Michael L. Paup, Richard W. Perkins and Murray S. Horwitz, Attys., U.S. Dept. of Justice, Washington, D.C., were on brief, for appellee.

Judith E. Bendich and Stephen K. Strong, Seattle, Wash., were on brief, for American Civil Liberties Union Foundation of Washington, amicus curiae, urging adherence to the interpretation adopted by the panel opinion in Neufeld v. IRS.

David C. Vladeck and Alan B. Morrison, Washington, D.C., were on brief, for John L. Neufeld and Freedom of Information Clearinghouse, amici curiae, urging adherence to the interpretation adopted by the panel opinion in Neufeld v. IRS.

Before ROBINSON, Chief Judge, and WRIGHT, WALD, MIKVA, EDWARDS, GINSBURG, BORK, SCALIA, STARR and SILBERMAN, Circuit Judges.

Opinion of the Court filed by Circuit Judge SCALIA.

Concurring opinion filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Circuit Judge WALD, with whom Chief Judge ROBINSON and Circuit Judge MIKVA join.

SCALIA, Circuit Judge:

This is an appeal from the District Court's grant of summary judgment in favor of the Internal Revenue Service, in a Freedom of Information Act suit brought by the Church of Scientology under 5 U.S.C. § 552(a)(4)(B) (1982). The only issue addressed by this en banc opinion is the meaning of the so-called Haskell Amendment, which excepts from the Internal Revenue Code's definition of nondisclosable "return information" "data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular

taxpayer." 26 U.S.C. § 6103(b)(2) (1982). Specifically, we consider whether to adhere to a 1981 panel decision of this court which held that that provision removes from the defined category of protected information all material which, either in its original form or as redacted in response to a FOIA request, does not disclose the identity of the taxpayer to whom it pertains.

## I

The facts of the present case are set forth in the panel opinion issued simultaneously with this opinion. For present purposes, it suffices to recite that the central issue in the appeal is the adequacy of the IRS's search for requested records; that one of the principal points bearing upon that issue is whether certain files could reasonably be excluded from the search as containing only "return information"; and that the latter point depends to a considerable extent upon whether redaction (specifically, elimination of portions of documents that would disclose the taxpayer's identity) removes the material from the protected category.

 After the case had been briefed and argued before the assigned panel, the court en banc, on its own motion, requested supplemental briefing and, on December 5, 1985, heard oral argument limited to the following issue:[1]

whether the Court should reconsider its holding in *Panhandle Eastern Pipe Line Co. v. FERC,* 613 F.2d 1120 (D.C.Cir.1979)").

The practice of segregating legal issues requiring the attention of the full court from the remainder of the case reflects the fact that appellate review serves a dual purpose: the correction of legal error and the establishment of legal rules for future guidance. Only the latter is ordinarily worthy of the attention of the full court. The dissent's perception that judges "typically" dispose of all the issues in a case, *see* Dissent at 172 n. 1, is simply not true at the second appellate level, where the law-clarifying function predominates. The Supreme Court often, if not usually, grants certiorari only on one or more discrete points of law, and issues its opinions (in that sense) on "legal issues, as opposed to concrete factual scenarios." En banc consideration (or *Irons* footnote disposition) effectively constitutes such second-level appellate review—at least where, as is the case here, the full court has before it the full text of a proposed panel opinion. It would be especially perverse to abandon our efficient practice of limited en banc disposition just as our caseload

---

1. Judge Wald's dissent expresses concern over "the court's recent practice of issuing en banc opinions on legal issues, as opposed to concrete factual scenarios, *see also Foster v. United States,* 783 F.2d 1082 (D.C.Cir.1986) (en banc)." Dissent at 172 n. 1. That concern must logically extend, of course—and should indeed have heightened application—to the court's common practice of rendering en banc decisions on isolated legal issues *without* en banc rehearing, by means of a so-called *"Irons* footnote" added to the panel opinion, reflecting the fact that departure from prior law of the circuit has been approved by the full court. *See, e.g., Telecommunications Research & Action Center v. FCC,* 750 F.2d 70, 75 n. 24 (D.C.Cir.1984); *In re: Commodity Futures Trading Comm'n,* 738 F.2d 487, 496 n. 19 (D.C.Cir.1984); *Irons v. Diamond,* 670 F.2d 265, 268 n. 11 (D.C.Cir.1981). Indeed, it must logically extend to the even more venerable practice of en banc *reconsideration* of issued panel opinions limited to specific issues—a practice we indulged in only a few weeks ago. *See Northern Natural Gas Co. v. FERC,* 780 F.2d 59, 64 (D.C.Cir.1986) (order granting rehearing en banc "for the limited purpose of deciding

Should the Court adhere to the interpretation of 26 U.S.C. § 6103(b)(2) adopted by the panel opinion in *Neufeld v. IRS,* 646 F.2d 661, 665 (D.C.Cir.1981), or should it adopt a different interpretation, in particular that announced by the Seventh Circuit in *King v. IRS,* 688 F.2d 488, 490–94 (7th Cir.1982)?

Briefs *amicus curiae* were received from the American Civil Liberties Union Foundation of Washington and from Professor John L. Neufeld and the Freedom of Information Clearinghouse.

## II

In relevant part, 26 U.S.C. § 6103(a) provides as follows:

Returns and return information shall be confidential, and except as authorized by this title—

(1) no officer or employee of the United States, . . . .

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section. . . .

Willful violation of this provision is a felony. 26 U.S.C. § 7213(a)(1).

"Return information" is defined in the statute as follows:

(A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, over-assessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the

amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense, and

(B) any part of any written determination or any background file document relating to such written determination (as such terms are defined in section 6110(b)) which is not open to public inspection under section 6110, *but such term does not include data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer.*

26 U.S.C. § 6103(b)(2) (emphasis added).

The last clause in the defining paragraph is the Haskell Amendment, so called because it was inserted into the committee-proposed bill through a floor amendment introduced by that Senator. On the basis of that clause, the Ninth Circuit held in 1979 that data that do not identify a particular taxpayer because names, identifying numbers and other similar information have been deleted are not return information. *Long v. IRS,* 596 F.2d 362 (9th Cir. 1979), *cert. denied,* 446 U.S. 917, 100 S.Ct. 1851, 64 L.Ed.2d 271 (1980). In a later case before this court in which the IRS had not briefed the question, the panel found it necessary to reach the issue and, without analysis of its own, followed what was at the time the only court of appeals precedent. *Neufeld v. IRS,* 646 F.2d 661, 665 (D.C.Cir.1981). In so doing, the panel observed that "[w]hile the IRS wishes to reserve the question of the proper statutory definition of return information for another day, it appears to concede, for this case only, that [no harmful error occurred] if in fact [the district court] employed the definition of return information articulated in *Long.*" *Id.* (footnote omitted). Subsequently, the Seventh Circuit reached a conclusion different from *Long,* holding that the statute "protects from disclosure all non-amalgamated items listed in subsection

---

has steeply increased, and as the size of the court has been expanded, magnifying the number of judge-hours devoted to each issue handled en banc. The proposal to restrict "piece-

meal" consideration would have the effect of making it inordinately difficult to alter prior law of the circuit or to correct panel decisions that adopt erroneous new rules.

(b)(2)(A), and that the Haskell Amendment provides only for the disclosure of statistical tabulations which are not associated with or do not identify particular taxpayers." *King v. IRS,* 688 F.2d 488, 493 (7th Cir.1982). The newly emerged circuit conflict has induced us to reconsider the position stated in our 1981 panel decision.

The starting point of analysis, of course, is the text of the provision at issue, which, we agree with the Seventh Circuit, is ill suited to achieve the result pronounced in *Long.* It would be most peculiar to catalogue in such detail, in subparagraph (A) of the body of the definition, the specific items that constitute "return information" (*e.g.,* "income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, over-assessments, or tax payments, ... or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return") while leaving to an afterthought the major qualification that none of those items counts unless it identifies the taxpayer. Such an intent would more naturally have been expressed not in an exclusion ("but such term does not include ...") but in the body of the definition—by stating, for example, that "the term 'return information' means the following information that can be associated with or identify a particular taxpayer: ...." If the intended scope of the exclusion is as broad as *Long* holds, the structure of the provision is akin to defining mankind as "all mammals in the world, but excluding those that are not relatively hairless bipeds with the power of abstract reasoning." While such a form of definition is conceivable, it would constitute "everyday language" (as the dissent characterizes it, Dissent at 174) only for one of Lewis Carroll's characters, and it hardly takes "talmudic dissection[]" or "microscopic scrutiny," *id.,* to reject it as implausible.

The *Long* interpretation produces a similarly mindless consequence in subparagraph (B) of the definition of return information. That subparagraph includes within the definition of return information IRS-written determinations and related background files that are *not* open to public inspection under § 6110. The latter section excludes from the public inspection requirement not only identifying data, § 6110(c)(1), but many other matters, such as trade secrets, § 6110(c)(4), information prepared for the use of an agency regulating financial institutions, § 6110(c)(6), and (with respect to most written determinations) material relating to a taxpayer's change of annual accounting period, § 6110(g)(5)(B)(ii). It would be absurd to incorporate these exclusions so precisely into the body of the definition of return information, and then, in the immediately following clause, to write all of them back out—except the identifying data exclusion (§ 6110(c)(1)), which is not deleted by the Haskell exclusion but merely rendered entirely redundant.

We also agree with the Seventh Circuit that the formulation of the Haskell provision itself suggests something other than merely the absence of identifying information. It would be strange to express the latter thought by excluding "data *in a form* which cannot be associated with, or otherwise identify ... a particular taxpayer" (emphasis added). The emphasized phrase would be superfluous for that purpose, as reading the provision without it will demonstrate. A more natural formulation for the purposes which *Long* assigns would be similar to that contained in the provision of FOIA that "an agency may *delete identifying details,*" 5 U.S.C. § 552(a)(2) (emphasis added); or similar to the formulation used elsewhere in this same Subchapter of the Internal Revenue Code, that no publication shall "permit ... information ... to be associated with, or otherwise identify, directly or indirectly, a particular taxpayer," 26 U.S.C. § 6108(c). Moreover, it is curious usage to describe an item of return information (a particular taxpayer's tax "payments," for example) as having one "form" when made public in a document that includes the taxpayer's name, and taking a different "form" when made public in the very same document with only the name deleted.

What is suggested by the language of the provision itself is strongly confirmed by other provisions of § 6103. Subsections 6103(f)(1) & (2) and subsection 6103(f)(4)(A) permit disclosure of return information to certain committees of Congress, and subsection 6103(f)(4)(B) to the full Senate or House; under all four provisions, however, unless the taxpayer consents in writing the disclosure must be made to the pertinent committee or house "sitting in closed executive session" when it concerns "return information which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer." If *Long's* interpretation of the Haskell Amendment is adopted, the exception in these provisions completely consumes the rule. That is to say, if return information consists, as *Long* says, of *nothing but* identifying data, then *whenever* it is provided under these provisions the receiving committee or house must sit in executive session. Quite plainly, these provisions contemplate return information that is nonidentifying.[2]

In addition to clear textual indications, rejection of the *Long* interpretation is suggested by assessment of plausible legislative intent. It is of course true, as two of the *amici* have asserted, that there is no reason "why Congress would have wanted to forbid the disclosure of information which would not threaten the privacy of individual taxpayers." Brief of Neufeld and Freedom of Information Clearinghouse at 5. But it is also true that the threat to privacy is *not* entirely eliminated by agency and (ultimately) judicial assessment that certain deletions in response to a FOIA request will suffice to conceal the taxpay-

er's identity. The protection afforded by such assessment is always problematic, not only because of the risk of human error, but also because the assessment depends to a large extent upon uninformed estimations as to what data the requester possesses. Consider, for example, a FOIA request for the amounts and beneficiaries of all charitable deductions claimed by taxpayers within a particular postal ZIP code area during a particular tax year. That information would normally not identify the charitable gift of any particular taxpayer; but it would do so if the requester had been told by his neighbor that the latter made a charitable gift last year of $2,775.

■ For most information possessed by the government, Congress has determined that the risk of occasional unknowing disclosure of facts entitled to be withheld under FOIA is outweighed by the benefits of openness. But it has not made that judgment for all information. *See, e.g.,* 50 U.S.C.A. § 431 (West Supp.1985) (exempting Central Intelligence Agency operational files from FOIA). It is significant that FOIA's nonidentification protection has not been considered adequate for the other major category of personal information that the government directs all its citizens to provide: Under the same Exemption 3 at issue here, 5 U.S.C. § 552(b)(3), all census data are protected from disclosure, whether or not they identify the individual to whom they pertain. *See Baldridge v. Shapiro,* 455 U.S. 345, 102 S.Ct. 1103, 71 L.Ed.2d 199 (1982). We think similarly heightened protection was intended with regard to tax information, in order to encourage the full, voluntary self-assessment

---

**2.** The dissent refers to all the strange textual consequences of the *Long* interpretation as "stylistic superfluity," which it equates in character with textual imperfections that remain under our interpretation of the amendment. Dissent at 176–. The latter, however, consist of nothing more than repetition, in later sections, of the exemption which (under our interpretation) the Haskell Amendment has already provided. This cannot reasonably be compared with the Alice-in-Wonderland definitional structure, *see supra* at 157, the pointless incorporation in the definition of exceptions that have no application, *see supra* at 157, and the provisions for open meet-

ings that can never occur, *see supra* at 157–158, that are the consequences of *Long.* The dissent's indiscriminate totaling of textual imperfections also happens to be inaccurate. One of the "superfluities" which it attributes to our interpretation is not that, since the section in question, § 6108(c), is not specifically tied to the term "return information." Moreover, both of the minor imperfections in our interpretation subsist under the *Long* interpretation as well, and the dissent seems to have miscounted the distinctive problems of *Long* we have discussed. The simplistic "score" is not 5–3, as the dissent asserts, but 9–2.

of taxes upon which our internal revenue system largely depends.

The intent to provide this increased assurance of confidentiality is conveyed by the detailed provisions of § 6103 rigidly restricting the use of tax information within the government itself, and by the severe criminal penalty (up to five years imprisonment) for unlawful disclosure. *See* 26 U.S.C. § 7213(a)(1). It is particularly apparent, however—and the incompatibility of the *Long* interpretation is particularly clear—from the provisions of § 6110, which set forth procedures for public inspection of IRS written determinations and related background files. Unlike most governmental information obtainable under the Freedom of Information Act, which one or more members of the public may be interested in for reasons that amount to no more than curiosity, there is special reason for making written determinations public, since without such a requirement agencies could develop "secret law." Thus, FOIA requires such determinations not merely to be provided upon written request, but to be made available in the agency's reading room, and to be reflected in a current index that is publicly distributed. 5 U.S.C. § 552(a)(2). Yet in the case of tax information, § 6110 provides *greater* protection against improper disclosure of this publicly essential information than FOIA provides against disclosure of data in which there is no reason to posit any public need to know. Specifically, the subject of the written determination is given a right to prior written notice of the Secretary's intention to disclose, an administrative remedy to prevent the disclosure, a cause of action in the Tax Court if that remedy is unsuccessful, a right to intervene in any action seeking disclosure, and even a cause of action for damages in the Claims Court for improper disclosure. 26 U.S.C. § 6110(f), (i). In the judicial proceedings to restrain disclosure or to require further disclosure, there is no requirement similar to the provision of FOIA that "the burden is on the agency to sustain" the withholding. *See* 5 U.S.C. § 552(a)(4)(B). It would be absurd to provide such guarantees against disclosure of

identifying information in the context of written determinations while relying upon no more than the FOIA protections (through *Long's* interpretation of the Haskell Amendment) when a request for less publicly important return information is received.

The dissent criticizes our use of standard textual analysis on the ground that, while it may be appropriate where Congress "labored arduously over each choice of word and each comma," it is improper "when the legislative history shows that a provision was injected into the bill at the tail end of the process." Dissent at 174. We need not pause to consider the theoretical deficiencies of such an approach to statutory construction, since it is in any case not properly applicable here. The (ill-considered) Haskell Amendment was not adopted separately and distinctly from the other provisions that we seek to reconcile with it. As we noted earlier, it was not an amendment to a preexisting law, but an amendment to the bill as originally presented on the floor. Congress did not pass into law the Haskell amendment *by itself,* but as part and parcel of an exceedingly detailed and complex legislative scheme, on which it *had* "labored arduously over each choice of word and each comma." Since all the provisions were enacted simultaneously, there is no plausible justification for focusing on the hastily considered nature of one of them and ignoring the carefully crafted character of the remainder.

In fact, far from militating in favor of the broad *Long* interpretation, the last-minute and cursory manner in which the Haskell Amendment was proposed and adopted greatly augments the implausibility of that interpretation. The massive effect of the amendment, if *Long* is correct, was to change the scope of protection from all "return information," as carefully and expansively described in § 6103(b)(2), to merely all such information which would identify the taxpayer. That change would not only make superficially nonidentifying information available to FOIA requesters, and thereby frustrate the carefully drawn

protections against such disclosure contained in § 6110, but it would also allow such information to be circulated freely within the government (since the defined term "return information" is central to both those provisions governing public disclosure and those governing inter-agency dissemination). We are asked to believe that this fundamental change in the committee proposal that the members of the Senate had (presumably) studied was made by this brief proviso at the last minute, without any statement by its sponsor that it had an effect upon anything except statistical studies and compilations of data, *see infra* at 161, without a floor vote (it was adopted by consent), without dissent from even a single member of the Senate, and indeed without any comment by any members of the body who might have been present except Senator Long's remark: "Mr. President, I will be happy to take this amendment to conference. It might not be entirely necessary, but it might serve a good purpose." 122 CONG.REC. 24,012 (1976). Rather than embrace this implausibility it would make more sense—if one were to favor the dissent's approach of using supposed inadequacy of consideration as a basis to ignore, rather than seeking to reconcile, textual conflicts—to endorse the position urged by the government, to wit, that all the befuddled Congress meant to do (never mind that the text will not bear it, *see infra* at 161–62) was to add the tax model to the disclosure exceptions of § 6108.

### III

▮ It is much easier to discern what the Haskell Amendment does not mean (*viz.,* what *Long* suggests) than what it does. If, as we have concluded, it does not exclude from the definition of return information *all* nonidentifying data, what particular nonidentifying data does it exclude? Again we think the key is the crucial phrase "in a form." It is significant that this phrase is *not* contained in the provisions discussed earlier which seek—in language otherwise almost identical to the Haskell Amendment—to describe *all* iden-

tifying data. *See* §§ 6103(f)(1) & (2); 6103(f)(4)(A) & (B). But it *is* contained in two other portions of § 6103. Subsection (j), entitled "Statistical use," permits disclosure of return information (1) to the Secretary of Commerce "for the purpose of, but only to the extent necessary in, the structuring of censuses and national economic accounts and conducting related statistical activities authorized by law"; (2) to the Chairman of the Federal Trade Commission, "for the purpose of . . . administration . . . of legally authorized economic surveys of corporations"; and (3) to the Department of the Treasury, "for the purpose of . . . preparing economic or financial forecasts, projections, analyses, and statistical studies and conducting related activities." The last paragraph of the subsection, entitled "Anonymous form," concludes:

> No person who receives . . . return information under this subsection shall disclose such . . . return information to any person other than the taxpayer to whom it relates except *in a form* which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer.

§ 6103(j)(4) (emphasis added). In this context, the meaning of the emphasized phrase seems clear: It is evidently meant to permit the publication and distribution of the statistical studies, forecasts and surveys that are the purpose of the permitted disclosures to Commerce, the FTC and Treasury. The phrase envisions, in other words, not merely the deletion of an identifying name or symbol on a document that contains return information, but agency *reformulation* of the return information into a statistical study or some other composite product—presumably on the theory that such reformulation gives added assurance that a taxpayer's identity will in fact not be disclosed.

The same meaning fits the other instance in which the phrase "in a form" appears as a disclosure limitation in § 6103. Subsection (i)(7)(A) provides that return information "shall be open to inspection by, or disclosure to, officers and employees of the

General Accounting Office" for the purpose of conducting legally required audits. Such officers and employees are prohibited, however, from disclosing to others "return information ... in a form which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer." This seems designed to assure that the reformulations of raw return information in the audit reports prepared by GAO officers and employees, if they are to be made public, be carefully devised to avoid the disclosure of identifying data. Once again the phrase is associated with a *reformulation* of the return information. Significantly, the phrase is not used where the subject of the provision is not "return information" but material that has *already* been reformulated. The concluding provision of § 6108 prescribes that no publication or disclosure of the statistical studies and compilations authorized by that section "shall in any manner permit the statistics, study, or any information so published, furnished, or otherwise disclosed to be associated with, or otherwise identify, directly or indirectly, a particular taxpayer." 26 U.S.C. § 6108(c).

■ The United States has argued in this appeal that the only type of reformulation that the Haskell Amendment exempts is that envisioned by the last mentioned section. The consequence of this interpretation, of course, is that the Haskell Amendment becomes substantively superfluous, amounting to no more than a reminder in the definition section that § 6108 permits disclosure of statistical data. That alone may not be fatal since, as far as we can discern, *any* interpretation of the amendment, including the one we adopt, creates some redundancy. The insuperable problem, however, is that there is absolutely no textual basis for limiting the phrase "in a form" to the precise types of reformulation set forth in § 6108. It is not likely that such a surgically exact result would be described by that vague term, rather than by the simple and precise statement that return data "does not include statistical studies and compilations prepared under authority of § 6108." To support the suggested limitation, the government resorts to what the Seventh Circuit in *King* called the "scant legislative history" of the Haskell Amendment, 688 F.2d at 492, consisting principally of the following statement by Senator Haskell on the Senate floor:

[T]he purpose of this amendment is to insure that statistical studies and other compilations of data now prepared by the Internal Revenue Service and disclosed by it to outside parties will continue to be subject to disclosure to the extent allowed under present law. Thus the Internal Revenue Service can continue to release for research purposes statistical studies and compilations of data, such as the tax model, which do not identify individual taxpayers.

The definition of "return information" was intended to neither enhance nor diminish access now obtainable under the Freedom of Information Act to statistical studies and compilations of data by the Internal Revenue Service. Thus, the addition by the Internal Revenue Service of easily deletable identifying information to the type of statistical study or compilation of data which, under its current practice, has been subject to disclosure, will not prevent disclosure of such study or compilation under the newly amended section 6103. In such an instance, the identifying information would be deleted and disclosure of the statistical study or compilation of data be made.

688 F.2d at 493 (quoting 122 CONG. REC. 24,012 (1976)). As *King* noted, this statement was made in response to a question whether the IRS could avoid disclosing statistical studies simply by adding identifying information, and thus was not *necessarily* intended as a comprehensive expression of the purpose of the amendment (though it assuredly adds no support to the textually implausible *Long* interpretation). Even disregarding that limitation, however, the statement simply does not support the government's narrow construction. It refers not only to "statistical studies" but

also to "compilations of data, such as the tax model." The latter is not a statistical tabulation. At the time the Haskell Amendment was adopted, it appears to have been an actual return with identifying details eliminated. Several years later, perhaps out of recognition that the 1976 legislation no longer permitted such redacted material to be made public, it was altered to consist of a reformulated return, with substitution of new figures for certain items—a partly factual, partly fictional return, so to speak.[3] There is no way that the tax model can be brought within the publication exemptions of § 6108. Even if

the provision of § 6108(b) which permits preparation and disclosure of "special statistical studies and compilations" is interpreted in such fashion that the adjective "statistical" does not modify "compilations" (which seems to us strained), the tax model—which the Secretary had prepared and made public for years before the Haskell Amendment and has continued to prepare and make public since—could not possibly come within that provision, since it is by no stretch of the imagination a "special" compilation prepared "upon written request by any party or parties," as § 6108(b) requires.[4]

3. The three sentences preceding this footnote sign did not appear in our original opinion, as issued in slip form. There the corresponding passage read as follows:

The latter is not a statistical tabulation but a sample return, derived from an actual return but reformulated to substitute new figures for certain items—a partly actual, partly fictional return, so to speak.

The revision was made to correct a factual inaccuracy brought to our attention by a post-decision motion of amicus American Civil Liberties Union of Washington, which noted that the description of the tax model presented to us by the government in oral argument and reflected in the foregoing passage was accurate for the period beginning about 1980, but was not accurate as of 1976, when the model was an actual return with identifying details eliminated.

The dissent's suggestion, Dissent at 176 n. 7, that our decision turned upon this mistaken factual assumption is demonstrably wrong. Our rejection of *Long*, set forth in Part II of this opinion, was made and continues to be made *without any reference to* this snippet of legislative history. And the only reason for raising it in this Part III of our opinion is to refute the government's position, which relies upon it. The factual inaccuracy in the case as originally presented to us shows the wisdom of relying upon the text and structure of the statute rather than *this statement by a single senator* as a means of ascertaining the Congress' intent. We have no way of knowing whether Senator Haskell's understanding of the tax model—much less that of his colleagues, if any of them relied upon his remark—comported with our original understanding or rather with what we now know. The mere term "Tax Model" assuredly does not suggest a redacted actual return.

4. The absence of any textual basis in § 6108 for publication of the tax model seems to us a complete response to the concurring opinion's contention that *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), requires us to defer to the agency's interpretation of the stat-

ute. There is some question, to begin with, whether an interpretive theory put forth only by agency counsel in litigation, which explains agency action that could be explained on different theories, constitutes an "agency position" for purposes of *Chevron*. Even granting that principle, however, it cannot possibly have application where counsel's interpretation in fact does *not* explain agency action but is, to the contrary, incompatible with the agency's settled course of conduct. That is the situation here, since the IRS has regularly released, and plans to continue to release, the tax model. Nor does it suffice to appeal to Senator Haskell's explicit reference to the tax model as the agency's justification for this singular departure from its (supposed) § 6108 theory. Legislative history is used to clarify the meaning of a text, not to create extra-statutory law. If it can ever be the basis for plainly departing from the text, it assuredly cannot be so when an interpretation that honors both the text and the history is available.

The concurrence claims that agency counsel did not take the position that the Haskell Amendment referred exclusively to § 6108, but rather maintained that the phrase "data in a form" in § 6103 referred exclusively to the statistical studies covered by § 6108 *and* to the tax model. Concurrence at 171. The oral argument contained the following exchange:

[COUNSEL]: ... [I]t is certainly arguable that the Haskell Amendment is redundant in light of 6108.

....

QUESTION: ... Your interpretation of the Haskell Amendment is § 6108?

[COUNSEL]: That's right and that is why Senator Long didn't think it was all that necessary....

Corrected Tr. of Oral Argument at 28 (Dec. 5, 1985). This concession was not, as the concurrence contends, a matter of government counsel's "hav[ing] been momentarily caught off guard by the court's vigorous questioning." Concurrence at 171 n. 10. To the contrary, what prompted the concession (and what prompted the questioning) was the carefully

We may add that, for similar reasons, we find no support in text or legislative history for the Seventh Circuit's statement in *King* that "the Haskell Amendment provides only for the disclosure of *statistical tabulations* which are not associated with or do not identify particular taxpayers." 688 F.2d at 493 (emphasis added). We hold, more broadly than *King*, that as used in § 6103(b)(2) the phrase "data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer" requires—in addition to the fact of nonidentification—some alteration by the government of the form in which the return information was originally recorded. That reformulation will typically consist of statistical tabulation or of some other form of combination with other data so as to produce a unitary product that disguises the origin of its components (as in the tax model). We need not define, for purposes of the present appeal, all other manners of reformulation that may be included.[5] It suffices to say that the mere deletion of the taxpayer's name or other identifying data is not enough, since that would render the reformulation requirement entirely duplicative of the nonidentification requirement.

We do not pretend that the interpretation we have given the Haskell Amendment

considered and frequently repeated assertion in the IRS's brief to the full court that the Haskell Amendment covered only "information ... amalgamated into statistical data," Supp.Brief for Appellees at 4, 6, and information "likely rendered anonymous by amalgamation into general statistics," *id.* at 9; and that the purpose of the Amendment was "to permit the Internal Revenue Service to continue its collection and release of general statistics," *id.* at 11, and "to permit the release of historically provided statistical data compiled from return information," *id.* at 20. These expressions are subject to no interpretation other than that the Haskell Amendment excludes from the definition of "return information" only the statistical studies and compilations already covered by § 6108. The problem counsel faced at oral argument was reconciling this theory with the embarrassing fact (first brought to the IRS's attention, evidently, by the Appellant's Supplemental Brief, filed simultaneously with its own) that the tax model is not a statistical study or compilation. We thought, in light of the above-quoted concession at oral argument, that counsel was seeking to mend his hold by adhering to the IRS's original theory of equivalence between the Haskell Amendment and § 6108, but explaining the tax model as a legislative-history-prescribed

causes it to fit with perfect consistency into the body of Chapter 61 or even, less ambitiously, § 6103. It causes the provisions of § 6103(j)(4) and § 6103(i)(7)(A), discussed above, to be superfluous. But that superfluity is nothing beside the textual and policy absurdities produced by the interpretation in *Long*—and exceeds the superfluity produced by the government's interpretation only because the latter inexplicably limits its "statistical" restriction to the statistics referred to in § 6108. As we have construed the Haskell Amendment, it creates no more disruption of the carefully drawn statutory scheme than is commonly produced by the dread genre of floor amendment; indeed, with a scheme as detailed as this it is remarkable that the dislocations are not greater. We are persuaded, in any case, that the meaning we have assigned is the meaning most faithful to the text, most compatible with the remainder of the legislation, and most supportable by a plausible legislative intent.

\* \* \* \* \* \*

Application of our holding to the facts of the present case, and the other issues presented by the instant appeal, are left to the disposition of the panel, whose opinion is issued simultaneously with this.

*So ordered.*

expansion of what the word "statistics" includes. The concurrence chooses to interpret the discussion as utterly abandoning the position that "data in a form" means statistics only (§ 6108) and embracing instead the view that it means statistics plus (exclusively) the tax model. This merely substitutes for the vice of nontextual amendment to § 6108 the vice of nontextual amendment to § 6103, since in no way can the crucial words "data in a form" be categorically limited to statistical studies, the tax model, and nothing else. (Nor is there any apparent reason why Congress should assume that, of all conceivable nonstatistical amalgamations, only the tax model would be sufficiently helpful and would sufficiently secure anonymity to justify publication.) Whatever position counsel was taking, one thing is clear: it is impossible to find here the sort of clear and consistent agency view (even as purportedly expressed by counsel) that must be given deference.

5. Given the purpose of the reformulation requirement, however—to wit, the increased assurance of anonymity—we can readily opine that it does not include the dissent's example of copying the same data "onto a fresh piece of paper, perhaps in narrative style." Dissent at 175.

SILBERMAN, Circuit Judge, concurring:

The court confronts in this case a difficult issue of statutory interpretation. The puzzle begins with 26 U.S.C. § 6103 (1982), which provides generally for nondisclosure of "return information" in the interest of taxpayer confidentiality. All sides agree that the heart of this controversy is the proper interpretation of the Haskell amendment, which authorizes the agency to release material that otherwise could not be released because it would be (but for the Haskell amendment) "return information." In other words, what does the phrase "data in a form which cannot be associated with or otherwise identify, directly or indirectly, a particular taxpayer" mean? But I believe there is another question presented of equal importance: Did Congress intend that the IRS's interpretation of what constitutes such "data in a form ..." be given deference by the judiciary?

I think it must be conceded that Section 6103 is, at the very least, ambiguous as to the issue now before the court. Nothing in the language of the statute itself yields a decisive understanding as to whether *Neufeld* or *King* is a more faithful rendering of the statute's purpose. The legislative history is sparse and inconclusive on the *Neufeld/King* question. Against the backdrop of this ambiguity the parties argue for divergent interpretations of this provision. The agency argues that the Haskell amendment means that data must be amalgamated *or combined in a different form* (Appellee's Supp.Br. at 5 n. 4) and specifically points to data "rendered anonymous by amalgamation into general statistics" as satisfying that test (*Id.* at 9).[1] The agency relies heavily on the adoption of this interpretation by the Seventh Circuit in *King* and further argues that a broader definition—such as that adopted by the majority—apart from creating certain anomalies and inconsistencies in the statutory scheme, presents troublesome administrative problems. The Secretary, we are told, has grave difficulty in determining the ability of one who requests information to "correlate facially nonidentifying data with specific taxpayers." Appellees' Supp.Br. at 13. The Church, on the other hand, argues that any document in the IRS files that contains return information must be disclosed provided that identifying information is first redacted. Through the majority opinion, this court rejects as excessively narrow the agency's construction of the statute and offers yet another construction. It concludes that the Haskell amendment exempts from the general rule of nondisclosure nonidentifying return information that has also undergone "agency *reformulation* ... into a statistical study or some other composite product...." Maj.Op. at 160 (emphasis in original). Each of these interpretations is, in my view, a reasonable construction of a difficult statute, but I disagree with the majority's decision to treat its own construction as authoritative. I believe the majority's approach oversteps the limitations on the court's proper role as defined in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The message of *Chevron* is emphatic. A court's duty in matters of statutory construction is to give effect to congressional intent. If that intent is not precisely apparent, however,

> the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 843 (footnote omitted). Beyond this we cannot go.

I believe *Chevron's* instruction applies to the issue of statutory construction now before the court. Section 6103(b)(2), set out in full in the majority opinion at page 156, defines return information by enumerating several different categories of information, but qualifying the enumeration with the words of the Haskell amendment "but such

---

1. The agency's brief did not contend that such statistical information was necessarily limited to the statistical compilations described in Section 6108, nor do I. And at oral argument agency counsel reiterated that the tax model would be included within the agency's construction of the Haskell amendment, as the *King* court had concluded in 1982. *King* treated the tax model as a statistical tabulation. 688 F.2d at 493. In light of the *King* discussion I fail to understand the majority's "surprise" theory. Maj.Op. at 162 n. 4.

term does not include data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer." 26 U.S.C. § 6103(b)(2) (1982). The words of the Haskell amendment seem to me to cry out for application of the doctrine of deference expounded in *Chevron*. No one, it would seem, is better qualified than the Secretary to decide whether certain classes of information may be released in compliance with the Haskell amendment.

**I**

Before proceeding, I must address a question that the majority raises without answering—"whether an interpretive theory put forth only by agency counsel in litigation, which explains agency action that could be explained on different theories, constitutes an 'agency position' for purposes of *Chevron*." Maj.Op. at 162 n. 4. I think it is much too late to question whether the construction of Section 6103(b)(2) urged by agency counsel in this case really represents the IRS's position. We know that the IRS has been advancing its interpretation in courts throughout the country at least since 1982, when it persuaded the Seventh Circuit in *King* to adopt its position, and perhaps even before then. To suggest in these circumstances that the *King* analysis is *not* an "agency position" is to imply that IRS counsel are mavericks, disembodied from the agency that they represent. I reject that supposition. *See Ashland Oil, Inc. v. FTC*, 548 F.2d 977, 984–85 (D.C.Cir.1976) (MacKinnon, J., dissenting).

The precept that the agency's rationale must be stated by the agency itself stems from proper respect for the separation of powers among the branches of government. In the seminal case of *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), the Court explained that "a judicial judgment cannot be made to do service for an administrative judgment." *Id.* at 88, 63 S.Ct. at 459. Similarly, in *Investment Co. Inst. v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), the Court declined to defer to agency coun-

sel's interpretation, noting that "Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands." *Id.* at 628, 91 S.Ct. at 1097. In these cases, the Supreme Court declined "to substitute [its own] or counsel's discretion for that of the [agency]" because to do so would be "incompatible with the orderly functioning of the process of judicial review. This is not to deprecate, but to vindicate ... the administrative process, for the purpose of the rule is to avoid 'propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency.'" *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (citation omitted) (*Chenery II*)). In other words, the doctrine developed as a manifestation of judicial restraint. If courts were to accept an agency counsel's position that significantly differed from the agency's position, they would in effect substitute a judicial interpretation for the agency's.

The doctrine has been applied in a variety of cases. Courts have rejected as inadequate agency counsel's articulation of a statutory interpretation when that interpretation has been inconsistent with a prior administrative construction, *see Securities Indus. Ass'n v. Board of Governors of the Fed. Reserve Sys.*, 468 U.S. 137, 104 S.Ct. 2979, 2983–84, 82 L.Ed.2d 107 (1984); *Pitzak v. OPM*, 710 F.2d 1476, 1479 n. 2 (10th Cir.1983); when the record evidence before the court demonstrates no link between counsel's interpretation and administrative practice, *Alaniz v. OPM*, 728 F.2d 1460, 1465 (Fed.Cir.1984); or when agency counsel's interpretation is revealed as no more than a "current litigating position." *Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 567 F.2d 1174, 1177 n. 3 (2d Cir.1977); *see* McMillan & Peterson, "The Permissible Scope of Hearings, Discovery, and Additional Factfinding During Judicial Review of Informal Agency Action," 1982 Duke L.J. 333, 363 n. 163.[2] And in *Investment Co. Inst. v. Camp*, the Supreme Court de-

---

2. The notion that deference should not be accorded if the agency's interpretation appears to be no more than a "current litigation position" suggests a slightly different but related variation

on the original doctrine. But the IRS has, as far as I can tell, always sincerely asserted the *King* interpretation whenever it was appropriate to do so.

clined to credit agency counsel's statutory interpretation, offered in support of an agency regulation, where the Comptroller had "adopted no expressly articulated position at the administrative level as to the meaning and impact" of the relevant statutory provisions. 401 U.S. at 627, 91 S.Ct. at 1097. Those circumstances are not present in this case, however. The construction of the Haskell amendment was not even a central issue in this case in its administrative phase before the agency. There was no need then for the agency to set forth its position on that issue. It was not until the case came before the district court that the issue arose in any form. There the Church argued that in light of *Neufeld,* which had been decided during the district court litigation, the IRS could not tenably maintain that it need not even search files known to contain return information. The IRS, bound, of course, by the *Neufeld* court's construction of the Haskell amendment, argued to the district court that since the Church's request identified the taxpayer, "no information could be released by the Service that would be anonymous." Defendants' Memorandum in Reply to Plaintiff's Statement of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment at 3. On appeal before the D.C. Circuit panel, the IRS acknowledged that it was bound by *Neufeld,* but urged the court to reconsider *Neufeld* in light of *King.* Thus, at the first moment in the case when it was appropriate and relevant for the IRS to articulate its construction of the statute, it did so. *En banc* consideration of the issue ensued.

What is clear from all this is that the *King* analysis is in no way inconsistent with the basis for the agency's decision in the administrative appeal. *See* Appellee's Panel Br. at 24 n. 11. This is not a case like *Investment Co. Inst. v. Camp.* In that case, the Comptroller of the Currency, to whom Congress had only recently reassigned regulatory responsibility for national banks' trust activities, adopted, three decades after enactment of the Glass-Steagall Act, a regulation that departed from a long-settled interpretation of the statute. *See* 401 U.S. at 621–22, 91 S.Ct. 1094–95. The Comptroller plainly neglected to furnish an appropriate rationale for his actions at a stage in the proceedings where there was a compelling need to articulate a link between the statutory provisions and the new regulation. The time to provide a statutory interpretation that underpins a newly promulgated rule that sweeps away earlier interpretations of the statute is obviously at the time of the rulemaking. In informal administrative adjudicative proceedings that evolve into federal court litigation, by contrast, the issues may well be shaped and sharpened throughout the proceedings. I think it is enough that the agency, through its counsel, set forth its interpretation of the statute at the first moment when it was appropriate and relevant to do so.

Were the rule to be otherwise—were the courts to withhold deference unless an agency asserted its interpretation of a statute in a formal adjudication or agency rulemaking—we would be creating a strong incentive for government agencies and departments to undertake their business strictly through formal procedures. Although judicial review of administrative action has seemed in recent times to push in that direction, I doubt that much good can come of this trend or, more importantly, that it is justified by congressional direction. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). We should take care that a doctrine developed to restrain the judiciary not be transformed to serve as a justification for excessive judicial intervention.

In any event, if this court rejects *King* on the unwarranted assumption that *King* is not the IRS's "true" interpretation of the Haskell amendment, the agency presumably could undercut the court's holding merely by taking some more formal step to adopt *King* as the Commissioner's interpretation of the statute. This strikes me as an unseemly institutional *pas de deux.*[3]

---

**3.** If the agency were formally to adopt the *King* position, let us say through a regulation or interpretive rule, it would surely be entitled to deference before other circuits that have not as yet faced the need to interpret the Haskell amendment. But I really see no inherent reason why it would not be entitled to deference in this court in a new proceeding as well. That prospect suggests that if the majority is uncertain as to whether the *King* analysis is actually the IRS's position, it should order the case remanded to the agency to allow what it regards as an adequate demonstration to that effect.

## II

FOIA's general policy favors disclosure, but the statute also recognizes nine categories of exemptions from the general rule of disclosure. One of the exemptions, found at Section 552(b)(3), provides that

(b) This section does not apply to matters that are ...

(3) specifically exempted from disclosure by statute (other than section 552b of this title) provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

5 U.S.C. § 552(b)(3) (1982).

Thus, the language of Section 552 exempts statutes such as Section 6103 [4] from "[t]his section," which I take to mean the entire Section 552 in the absence of any other plausible reference. But Section 552 contains not only the disclosure requirements; it also contains the provision for de novo judicial review. While it is obvious that materials covered by exemption 3 are exempted from the disclosure requirement of Section 552, mere assertion that requested documents are covered by an exemption 3 statute will not serve to immunize items from disclosure. The de novo review sec-tion of FOIA requires courts to examine withheld documents to determine whether they are *in fact* covered by an exemption 3 statute. But that cannot possibly mean that the law applied in those proceedings is other than that embodied in the exemption 3 statute. That is to say, the definition or scope of "matters" covered by the exemption 3 statute must derive from the exemption 3 statute. It could come from nowhere else.[5]

I have found nothing in the legislative history of FOIA or its subsequent amendments that contradicts this analysis. The House Report accompanying S. 1160, the bill whose provisions were eventually codified as amended at 5 U.S.C. § 552, explained that "[t]he proceedings are to be de novo so that the court can consider the propriety of the withholding instead of being restricted to judicial sanctioning of agency discretion." H.R.Rep. No. 1497, 89th Cong., 2d Sess. 9 (1966), U.S.Code Cong. & Admin.News 1966, p. 2418. The Senate Report stated: "That the proceeding must be do novo is essential in order that the ultimate decision as to the propriety of the agency's action is made by the court and prevent [sic] it from becoming meaningless judicial sanctioning of agency discretion." S.Rep. No. 813, 89th Cong., 1st Sess. 8 (1965).[6]

---

4. We have held that Section 6103 is an exemption 3 statute; that is, it meets the criteria set out in subsection (b)(3). *Moody v. IRS,* 654 F.2d 795, 797 & n. 4 (D.C.Cir.1981); *see Chamberlain v. Kurtz,* 589 F.2d 827 (5th Cir.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Fruehauf Corp. v. IRS,* 566 F.2d 574 (6th Cir.1977); *see also Zale Corp. v. IRS,* 481 F.Supp. 486, 490 n. 13 (D.D.C.1979).

5. My reading of Section 6103 and FOIA nevertheless differs from the reasoning of *Zale Corp. v. IRS,* 481 F.Supp. 486 (D.D.C.1979), relied upon by *King.* The *Zale* court held that Section 6103 was a self-contained provision not subject at all to judicial review under FOIA. *Id.* at 489-90. The court held that Section 6103 contained its own standard governing disclosure or nondisclosure of tax return information and that decisions not to disclose were subject to review only under the Administrative Procedure Act. *Id.* In my view, this analysis goes too far. Section 6103 and FOIA are easily construed together without the need to ignore either provision.

6. In 1974 and 1976 Congress amended FOIA to clarify the meaning of de novo review and to tighten the focus of certain exemption provisions. To do this Congress explicitly overruled judicial precedents that it viewed as obstacles to fulfilling FOIA's pro-disclosure policy. In the 1974 amendments to FOIA, for example, Congress overruled the Supreme Court's decision in *EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). Congress viewed the Court's holding as having interpreted exemption (b)(1), relating to national security and foreign policy matters, too broadly. Congress clarified in the 1974 amendments that district court judges could conduct in camera inspection of classified documents and need not defer to the agency's decision to label a document classified. *See* S.Rep. No. 1200, 93d Cong., 2d Sess. 9, 12 (1974), U.S.Code Cong. & Admin.News 1974, p.

But does de novo review mean more than an independent examination of the facts in light of applicable law;[7] is it inconsistent with deference to an agency's reasonable construction of a statute it administers? In other words, must *Chevron* give way whenever a court is charged with de novo review?

I have concluded that *Chevron* does apply in such circumstances. The rule of *Chevron* is not a rule of judicial administration for courts to apply in reviewing administrative decisionmaking. It is an articulation of the fundamental principle that when Congress intends to delegate authority to an agency, that purpose demands recognition by the courts. I reason as follows.

In entrusting administration of a statute to an agency, Congress typically delegates to the agency concomitant authority to "fill any gap" that Congress has left. *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). Part of the legislative purpose with respect to a particular statute, then, is Congress' intent that the agency will exercise its delegated authority in fulfillment of the statute's purpose. Courts appropriately defer to an agency's reasonable interpretation of a statute that the agency administers, then, not simply out of recognition of the agency's expertise, but primarily out of respect for congressional intent.

In *Sims v. CIA*, 642 F.2d 562 (D.C.Cir. 1980), this court took an approach contrary to my analysis and treated the issue of statutory construction of an exemption 3 statute as a question of law "reserved ultimately to our determination." *Id.* at 568. In that case, the CIA declined to disclose documents that revealed the names of individuals and institutions that had participated in a controversial research program. The agency argued that the documents were "specifically exempted by statute" from disclosure within the meaning of Section 552(b)(3). The exemption 3 statute upon which the CIA relied was 50 U.S.C. § 403(d)(3) (1982), which authorizes the Director to protect "intelligence sources and methods from unauthorized disclosure." Appellants argued that the institutions and

---

6267 (stating intent to overrule *Mink*). Similarly, in 1976, Congress overruled *FAA v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), which had interpreted exemption (b)(3) to embrace a statute (and by implication a class of statutes) that Congress had not intended to include among those excusing disclosure. *See* H.R.Rep. No. 1441, 94th Cong., 2d Sess. 25 (1976), U.S.Code Cong. & Admin.News 1976, p. 2183 (stating intent to overrule *Robertson*).

The legislative history of the 1974 and 1976 amendments to FOIA does not discuss the term "de novo review" in any directly relevant respect. But the legislative history of the 1974 amendments does discuss the term in connection with new statutory language that narrowed the scope of exemption (b)(1) and clarified that a district court may order, as part of its de novo review of an agency's withholding determination, in camera review of classified documents. S.Rep. No. 1200, 93d Cong., 2d Sess. 8–9, 11–12 (1974). The Conference Report states that in camera inspection should not be automatically undertaken; that the agency should first receive an opportunity to demonstrate the correctness of its classification decision (the predicate for withholding documents under exemption 1) by means of affidavits. In deference to executive agencies' expertise in national security and foreign policy matters, the conferees stated their intent that courts should "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Id.* at 12, U.S.Code Cong. & Admin. News 1974, p. 6290. Thus, Congress recognized that even within the de novo review that it directed courts to conduct under FOIA, there was room for deference to the agency on factual issues relating to the availability of an exemption in a particular case within the agency's delegated area of responsibility.

7. The term de novo review, as it is used in the general judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 706(2)(F), is limited to an independent review of the relevant facts. Section 706 requires the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be— ... (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (Section 706(2)(F) authorizes de novo review in two circumstances only: (1) for adjudicatory agency action, if agency factfinding procedures inadequate; (2) in proceedings for enforcement of nonadjudicatory agency action, court may undertake independent factfinding as to issues not raised before agency).

individuals did not constitute "intelligence sources" within the meaning of the statute. Thus, the issue in the *Sims* case, as in this case, turned on construction of a term in the exemption 3 statute. On appeal, this court devised a definition of the term "intelligence sources" after reviewing the statute and its legislative history. The court stated that FOIA authorized the judiciary "to undertake de novo review" not only of "agency determinations that particular records fall within exemption classifications," but also of "agency constructions of applicable statutes." 642 F.2d at 566 (citation and footnote omitted). The court acknowledged that "[b]ecause the term 'intelligence ... sources' appears in the text of the National Security Act, it is appropriate for us to begin our analysis with the construction proposed by the CIA, an agency chartered by that statute and charged with major responsibility for its administration." 642 F.2d at 568 (citations omitted). The court continued, "But we must not shrink from the responsibility vested in us by Congress. The question presented is one of law reserved ultimately to our determination." *Id.*

The *Sims* court's observations as to the state of the law on deference to administrative agencies' determinations in 1980 were, in my view, overbroad and erroneous. It has always been true that statutory interpretation is a question of law but it is equally true that an agency's construction of its governing statute traditionally has been viewed as entitled to deference in certain contexts. As this court recognized in a case decided after *Sims*, although the

"APA appears to require *de novo* review of all questions of law ... courts almost always accord some deference to an agency's statutory construction." [8] *Office of Communication of the United Church of Christ v. FCC*, 707 F.2d 1413, 1422–23 n. 12 (D.C.Cir.1983); *see Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969); *Unemployment Comp. Comm'n v. Aragon*, 329 U.S. 143, 153–54, 67 S.Ct. 245, 250–51, 91 L.Ed. 136 (1946); *McLaren v. Fleischer*, 256 U.S. 477, 480–81, 41 S.Ct. 577, 577–78, 65 L.Ed. 1052 (1921); *Webster v. Luther*, 163 U.S. 331, 342, 16 S.Ct. 963, 967, 41 L.Ed. 179 (1896). *Chevron* has put a new gloss on these old truisms. *Chevron* tells us that if congressional intent respecting a statutory provision is not clear, we must not treat the issue of statutory construction as we would treat any other garden variety question of law. We must defer to another institution's determination—that of the agency charged to administer the law—provided, of course, that the agency's determination is reasonable. In this sense, I believe that *Chevron* supersedes the *Sims* court's overbroad analysis.

My view is further reinforced by the Supreme Court's treatment of the definitional issue when *Sims* came before that Court.[9] *CIA v. Sims*, 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985). Dismissing the court of appeals' definition of "intelligence sources" as too narrow, the Court stated:

> The plain meaning of the statutory language, as well as the legislative history

---

**8.** The *Office of Communications* court used the term "de novo" as shorthand for the introductory language in Section 706 that instructs courts reviewing agency action to "decide all relevant questions of law." 5 U.S.C. § 706 (1982). But as the quotation in text makes plain, *Office of Communications* did not purport to hold that such "de novo" determinations were to be made without deference to the agency's statutory interpretation.

**9.** The court of appeals' decision reported at 642 F.2d 562 (1980) (*Sims I*) set out a definition of the term "intelligence sources" and remanded the case for the district court to apply that definition. After the district court's decision on

remand, the case again came before the court of appeals. *Sims v. CIA*, 709 F.2d 95 (D.C.Cir. 1983) (*Sims II*). This court determined that the district court had not properly applied the definition set forth in *Sims I* and reversed and remanded the case. *Id.* at 100–01. The Supreme Court heard the case on the parties' cross-petitions for certiorari.

For a discussion of the *Sims* Court's "implicit view of a limited role for the judiciary" in reviewing agency claims of FOIA exemption 3, *see* Comment, CIA v. Sims: *Supreme Court Deference to Agency Interpretation of FOIA Exemption 3*, 35 Cath.U.L.Rev. 279 (1985).

of the National Security Act, ... indicates that Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure. The Court of Appeals' narrowing of this authority not only contravenes the express intention of Congress, but also overlooks the practical necessities of modern intelligence gathering—the very reason Congress entrusted this Agency with sweeping power to protect its "intelligence sources and methods."

*Id.,* 105 S.Ct. at 1887–88. This approach is consistent with *Chevron* insofar as it first undertakes an inquiry as to the clarity of the legislative intent. Having found clear indications of congressional intent in the language of the statute and its legislative history, the Court had no need to move to the next step of the analysis that *Chevron* directs—determining whether the administrative agency had advanced a reasonable interpretation of the statute to which the judiciary should defer. But the Court's recognition of the "practical necessities of modern intelligence gathering" that compelled Congress to delegate to the CIA "sweeping power" to protect "intelligence sources and methods" indicates that the Court's conclusion as to legislative purpose was buttressed by its understanding of the agency's delegated authority and practiced expertise. Similarly, here Congress has delegated to the Secretary of the Treasury authority to administer the federal income tax laws. And Section 6103 is an integral part of the mosaic of those tax laws because it directs the Secretary to protect return information from disclosure. Congress realized that the confidentiality of return information, which taxpayers usually provide voluntarily, is crucial to efficient administration of the tax laws. S.Rep. No. 938, 94th Cong., 2d Sess. 316–19 (1976), U.S.Code Cong. & Admin.News 1976, p. 2897. Naturally, the Secretary, like the Director of Central Intelligence in *Sims,* is better situated than the courts to determine when disclosure of information is likely to inhibit the collection of that information in the future. For that reason, Con-

gress quite understandably delegated to the Secretary some responsibility for further refining the meaning of "data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer."

## III

Applying the traditional principle of deference, as refined by *Chevron,* to this case, I conclude that we should defer to the agency's interpretation of Section 6103. As noted above, the agency's interpretation of Section 6103 is not an inevitable one but that is not the test. The *Chevron* Court indicated, rather, that when congressional intent is not clear

a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

467 U.S. at 844, 104 S.Ct. at 2782 (footnote omitted). Congress' implicit delegation of authority to the agency to refine the definition of "return information" is buttressed by the broad discretion conferred upon the Secretary in another portion of the statute to disclose return information if he determines that such disclosures would not seriously impair administration of the tax system. *See* 26 U.S.C. § 6103(e)(7) (1982) (release of return information to persons having material interest). This instance of statutorily-conferred discretion to disclose, albeit to a limited class of requesters, even information sensitive enough to be categorized as return information suggests that the prior determination of *what constitutes* nondisclosable return information ought to be informed by the agency's expertise.

The majority refuses to defer to the agency's interpretation because it asserts that the agency's practice is inconsistent with its interpretation of the statutory text. Specifically the majority focuses on the government's continued release of the tax model as fatal to its interpretation of the Haskell amendment. However, the majority does not contend that the tax model cannot fit easily within the general phrase "data in a form which cannot be associated

with, or otherwise identify, directly or indirectly, a particular taxpayer." 26 U.S.C. § 6103(b). That argument would, in any event, be tenuous in light of the explicit statement Senator Haskell made from the floor. He said that the amendment was intended to permit "the Internal Revenue Service [to] continue to release for research purposes statistical studies and compilations of data, such as the tax model, which do not identify individual taxpayers." 122 Cong.Rec. 24,012 (1976) (remarks of Sen. Haskell).

Instead, the majority raises what I view as an artificial textual barrier by ascribing to the government an argument not presented in its brief, and not necessary to its position,[10] that the Haskell amendment is identical in its scope of disclosure authority to Section 6108 and that Section 6108's text provides no authority to release the tax model. The agency, however, as I understand its position, maintains that the Haskell amendment was intended to authorize disclosure of statistical compilations such as those referred to in Section 6108 *and* disclosure of the tax model, which disclosure is apparently not otherwise authorized by the statute. The legislative history of the Haskell amendment amply supports the government's position that it was designed to authorize the *continued* release of data the government had released prior to its passage.

To be sure, there may not be a great deal of difference between the agency's interpretation of the Haskell amendment, adopted by the Seventh Circuit in *King*, and the majority's rendition. But the rule of *Chevron* requires us not to reason our

---

**10.** The majority opinion reproduces a portion of the colloquy at oral argument which it asserts establishes the IRS's position to be that Section 6103 permits release only of the statistical studies referred to in Section 6108. I do not believe that the colloquy, in context, establishes the IRS's position as such.

> THE COURT: Your reading of Section 6103 makes 6108 superfluous.
> COUNSEL: Not entirely, but it's certainly arguable that the Haskell amendment is redundant in the light of 6108.
> THE COURT: I don't understand that. Why the two if that is what Congress intended to do? ... As I read it over and over again, it's exactly the same. Your interpretation of the Haskell Amendment is right.
> COUNSEL: That is right. And that's why Senator Long said he didn't think it was really all that necessary....

Transcript of Oral Argument at 28–29 (Dec. 5, 1985) (conformed to tape recording of oral argument).

Counsel's apparent concession is not all it seems, however. Government counsel appears to have been momentarily caught off guard by the court's vigorous questioning, for counsel made it abundantly clear in his immediately subsequent exchanges with the court that the IRS's position was not confined to its understanding of Section 6108.

> THE COURT: There is no congressional intention to support that view anywhere.
> COUNSEL: ... I'm sorry, I can't agree with that.
> THE COURT: Well, where is it?
> COUNSEL: It seems very clear that Haskell was worried that the sweeping language of 6103(b)(2), that maybe legitimate scholarly

use, state and local government use of the tax model which had been going on since 1960, would be choked off. "Oh, my God, they've gone too far in defining return information." Well, 6108 was there, to be sure, but Haskell, perhaps not satisfied that one bite would be enough, thought that maybe he ought to have two, and he suggested that under those circumstances, in order to continue to make available for legitimate scholarly use *the tax model and similar studies* it would be important to say, that, well, data in a form that ... [the court interrupted].

*Id.* at 29 (conformed to tape recording of oral argument) (emphasis added).

This elaboration is consistent with IRS counsel's earlier statement that "[W]e submit it is very clear that the Haskell amendment was meant to permit the release of *the tax model and similar statistical studies* that were in an amalgamation form...." *Id.* at 25 (emphasis added). It is clear that the IRS never strictly limited its interpretation of the Haskell amendment to the terms of Section 6108. It viewed the Haskell amendment as permitting disclosure of the tax model and "similar statistical studies." This clearly leaves open the possibility of the creation of other statistical studies, outside the scope of Section 6108, whose release would be permitted under the Haskell amendment. I do not contend otherwise, contrary to the majority's suggestion. *See* Maj. Op. at 162 n.4. There may or may not be any statistical studies in existence or contemplated by the IRS that are outside of Section 6108; I do not know, nor did Congress—which, of course, is why (in addition to its authorization of the release of the tax model) the Haskell amendment is not redundant.

own way to an interpretation, even if it were one that the agency might find consistent with its own. Rather, *Chevron* requires us to defer to agency interpretations, such as the one at issue here, that merit deference. I am reinforced in my conviction that deference is the appropriate course in this case by the majority's unwillingness to specify the outer boundaries of its own interpretation, Maj.Op. at 163, thus presenting this court with a heightened prospect of further litigation focused on the exploration of those boundaries.

On the basis of the foregoing, I concur in the majority's opinion insofar as it overrules *Neufeld*. But I cannot join the opinion insofar as it rejects the agency's interpretation of the statute in favor of the majority's own.

WALD, Circuit Judge, dissenting, with whom SPOTTSWOOD W. ROBINSON, III, Chief Judge, and MIKVA, Circuit Judge, join:

### I.

I dissent from the court's newly adopted interpretation[1] of 26 U.S.C. § 6103(b)(2) saying that the IRS may never disclose data listed in the section even if there is no risk of identification, unless it has been "reformulated." The court reaches that interpretation based on its reading of the text of the Haskell Amendment, inferences it draws from the relationship between that Amendment and other sections of the Code, and its understanding of plausible legislative intent. I believe that these very same factors support a reaffirmance, rather than a rejection, of the interpretation of § 6103(b)(2) previously adopted by this court in *Neufeld v. IRS*, 646 F.2d 661 (D.C. Cir.1981).

I find nothing in the statutory text or structure to support the notion that wholly nonidentifying information[2] may not be disclosed unless it has been put in a different "form." Such an extreme and curious requirement is at odds with the majority's own recognition that "there is no reason 'why Congress would have wanted to forbid the disclosure of information which would not threaten the privacy of individual taxpayers.'" Maj. op. at 158 (quoting Brief of Neufeld and Freedom of Information Clearinghouse at 5). The *Neufeld* approach, in my view, comports best with Congress' balancing of the strong interest in taxpayer privacy and the equally strong interest in disclosure under the Freedom of Information Act whenever taxpayers' privacy rights are not implicated.

The interpretation adopted in *Neufeld* adequately safeguards the privacy concerns that the majority and I share. The court in *Neufeld* explicitly held that "mere deletion

---

1. Since the en banc court has considered only this discrete legal issue, and has left to the panel the application of its "holding to the facts of the present case," maj. op. at 163, my dissent must similarly focus on the legal issue of § 6103(b)(2)'s general meaning. I am concerned, however, that the court's recent practice of issuing en banc opinions on legal issues, as opposed to concrete factual scenarios, *see also United States v. Foster*, 783 F.2d 1082 (D.C.Cir. 1986) (en banc), poses problems. Judges typically do not issue advisory opinions on abstract legal issues because of the case or controversy requirement of Article III. While our practice here does not, of course, technically implicate those provisions, it does, in my opinion, raise some of the dangers that the case or controversy requirement protects against. For example, it is conceivable that a majority of the en banc court might think that this controversy could be disposed of on some narrower, factual ground than a wholesale repudiation of our old defini-

tion of § 6103(b)(2). Yet the contours of the issue that was heard en banc practically prevent such an alternative. Unlike Supreme Court review, where the justices review the entire record before deciding whether to hear a specific issue, our practice isolates the legal issue from its factual moorings altogether. I hope that, in the future, the court will be cautious in adopting this kind of piecemeal approach to en banc hearings. "The establishment of legal rules for future guidance," maj. op. at 155 n.1, best emerges out of fullfledged, fact-based adversarial proceedings, not judicial rulemaking.

2. It is essential to note that the disclosability of actual tax returns and other information filed by the taxpayer is not at issue here. Such items are covered by § 6103(b)(1), are not subject to the Haskell Amendment, and are thus wholly immune from disclosure under FOIA's exemption 3.

of names and addresses" does not automatically open the door for disclosure of items listed in § 6103 (b)(2). *Neufeld*, 646 F.2d at 665. Rather, the court remanded the case to the District Court for determination of "what information, other than name and address, poses a risk of identifying a taxpayer," *id.*, with the understanding that the nature of certain documents may render them entirely nondisclosable. *Id.* at 666. *See also Moody v. IRS,* 654 F.2d 795 (D.C.Cir.1981); *Long v. IRS,* 596 F.2d 362 (9th Cir.1979), *cert. denied,* 446 U.S. 917, 100 S.Ct. 1851, 64 L.Ed.2d 271 (1980).

I agree that the IRS faces a difficult task in determining just when enough information has been deleted to make the taxpayer unidentifiable. This task is no different, however, from the situation agencies often face under the redaction requirement of the Freedom of Information Act, 5 U.S.C. § 552(b), a requirement that applies even with regard to matters otherwise "specifically exempted from disclosure by statute" under FOIA's exemption 3. 5 U.S.C. § 552(b)(3). While I would grant considerable deference to the agency's expertise in determining when even seemingly anonymous tax data might lead the informed requester to identify a taxpayer, I believe that this determination is for the Service to carry out on a case-by-case or, at times, a document class-by-class basis, in the same fashion that the panel opinion accompanying the en banc decision requires the IRS to proceed with respect to documents not listed in § 6103. *See Church of Scientology v. Internal Revenue Service* (hereinafter "Panel op."), 792 F.2d 146, 152–153 (D.C.Cir. 1986).

In changing course so fundamentally, the court must beware of the effect that its decision will have on others who seek to review tax information in pursuit of varied goals. The plaintiff in *Neufeld,* for example, was a professor doing research into the practice of members of Congress, White House staff members, and other high government officials interceding on behalf of taxpayers in ongoing IRS proceedings. Neufeld "specifically disclaim[ed] any interest in information that would directly or indirectly identify individual taxpayers." *Neufeld,* 646 F.2d at 662. *See also Tax Reform Research Group v. IRS,* 419 F.Supp. 415 (D.D.C.1976) (public interest group researching Nixon Administration's actions pressuring IRS with respect to persons perceived as either "friends" or "enemies"). Yet, under the majority's holding today, the IRS is forbidden from disclosing § 6103(b)(2) data in its present form for research purposes to Neufeld, the Tax Reform Research Group, and countless other legitimate groups and scholars, even if the Service is wholly confident that there is no risk of disclosure whatsoever. Since the majority has failed to carry its burden in demonstrating that Congress intended to establish a distinct, statutory requirement of reformulation, I dissent.

**II.**

The majority's major premise is that the language of the Haskell Amendment, *i.e.,* "return information ... does not include data *in a form* which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer," 26 U.S.C. § 6103(b)(2) (emphasis added), means Congress established a "reformulation" requirement. No data listed in § 6103(b)(2) can ever be released unless it is physically put into a different document from that in which the information presently appears in the IRS files. Deletion of any and all identifying material will never be enough.[3]

---

**3.** Because it holds that § 6103(b)(2) requires *both* anonymity *and* reformulation, the effect of the majority's holding is not to require any redaction pursuant to FOIA, since that statute has been held not to require an agency to create new documents. *See Renegotiation Board v. Grumman Aircraft Engineering Corp.,* 421 U.S. 168, 192, 95 S.Ct. 1491, 1504, 44 L.Ed.2d 57 (1975); *Krohn v. Dep't of Justice,* 628 F.2d 195, 197–98 (D.C.Cir.1980). My approach, by contrast, reads § 6103(b)(2) as not precluding disclosure of data so long as the disclosed data cannot identify the taxpayer. Deletion of identifying information can, under this approach, take certain data out of the "return information" definition, and is thus mandated by the

Otherwise, the majority urges, the term "in a form" is made superfluous, "as reading the provision without it will demonstrate." Maj. op. at 157. In my view, however, the term "in a form" is far more easily understood as saying that the *substantive* types of information listed in § 6103(b)(2) are not "return information" if they can be disclosed in a *manner* that cannot identify a taxpayer. Thus, Congress meant to say no more than return information does not include data that, by itself or even in conjunction with other information, cannot be used to identify a particular taxpayer.

One can, of course, make talmudic dissections of everyday language to find hidden and profound implications. Unless statutory language is so clear that it compels a specific result, however, our task in statutory construction is to "ascertain the congressional intent and give effect to the legislative will." *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). *See generally id.* (" 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' ") (quoting *United States v. Heirs of Boisdoré*, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)); *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940) (cardinal principle of statutory interpretation is "to give effect to the intent of Congress"). If the history of a statute's enactment reveals that Congress indeed labored arduously over each choice of word and each comma, then it is likewise proper for us to analyze each word and comma with precision. But when the legislative history shows that a provision was injected into the bill at the tail end of the process, and that Congress made no apparent effort to remove every phrase the new amendment may have rendered superfluous, we only frustrate Congress' goals by holding its words up to microscopic scrutiny.

Judge Posner has pointed out that overemphasis on construing all statutes so as to avoid surplusage "rests on the unrealistic premise that [they] are drafted with complete economy of language.... There is 'useless surplusage' in contracts as in statutes, *J.C. Penney Co. v. Commissioner of Internal Revenue*, 312 F.2d 65, 72 (2d Cir. 1962), and in neither context should a court give effect to it." *White v. Roughton*, 689 F.2d 118, 120 (7th Cir.1982), *cert. den.*, 460 U.S. 1070, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983). There comes a point when a court must be realistic in deciding whether the drafter was using everyday expressions in the manner that we all do, or was instead creating a technical, statutory requirement. *Cf. American Radio Relay League v. FCC*, 617 F.2d 875, 879 (D.C.Cir.1980) ("courts will not give independent meaning to a word 'where it is apparent from the context of the act that the word is surplusage' ") (*quoting* 2A Sutherland Statutory Construction § 47.37, at 167 (4th ed. C. Sands 1973)); *see generally* 2A Sutherland Statutory Construction § 47.37, at 258 (4th ed. C. Sands 1984) (discussing rule that words in statute can be disregarded if context indicates that they were not intended as adding meaning).

The Haskell Amendment was introduced on the floor of the Senate in the closing days of deliberation on a major tax reform act. *See* 122 Cong.Rec. 24,012 (July 27, 1976). The Amendment engendered absolutely no debate.[4] Given this history,[5] or lack thereof, I cannot agree that the three little words "in a form" evince a clear intent of Congress that data otherwise disclosable under the Haskell Amendment because it is nonidentifying, cannot be disclosed unless it is somehow "reformulated." The fact is that most information governed by the Haskell Amendment is already likely to be in a form different from that originally submitted to the Service since the actual return submitted by the taxpayer is exempt from disclosure, without regard to identifiability. *See su-*

---

segregation requirement of FOIA. *See Neufeld*, 646 F.2d at 665–66.

Of course, my disagreement with the majority goes far beyond the applicability of the segregation requirement of FOIA. Because of its "reformulation" requirement, the majority forbids disclosure of any return information in its original state, even if the information, without the need for any redaction, is absolutely nonidentifying.

**4.** As the majority points out, the only *substantive* comment made was Senator Haskell's re-

mark about what effect the amendment would have on tax research. *See* maj. op. at 161.

**5.** The House passed no like provision, and the Conference Committee report states only that
The Senate amendment provides that returns and return information are confidential and not subject to disclosure except as specifically provided by statute.... Under the amendment, data in a form that cannot be associated with or otherwise identify a particular taxpayer will not constitute return information. S.Rep. No. 1236, 94th Cong., 2d Sess. at 476–77 (1976).

*pra* note 2. Conceding as it does that *aggregation* is not essential to fulfill the reformulation requirement, the majority has adopted a wooden test that turns on physical form, and in so doing has attributed an absurd intent to Congress. Under the majority's test, the IRS may only disclose nonidentifying information if it copies it onto a fresh piece of paper, perhaps in narrative style. Yet, there is certainly no evidence that such recopying accomplishes anything that redaction would not.

The majority concludes that Congress would not have used the "in the form" language had it not wanted to create a reformulation requirement. I, on the other hand, believe Congress would have used much clearer language had it wanted to create such an arbitrary and novel reshaping requirement, without a word of explanation on the floor or in the Conference Report. Given its own emphasis on dissecting the statutory language, and avoiding Alice in Wonderland definitional structures, maj. op. at 158 n. 2, I am startled by the apparent ease with which the majority is able to read the Haskell Amendment as creating *two separate* definitional elements. Nothing in the structure of the single sentence Amendment supports such a reading, only the majority's insistence on removing any trace of redundancy. Since nothing in the main body of § 6103(b)(2) discusses the "form" that the information is in, I cannot understand how the Haskell Amendment's use of the term "form" can be understood as allowing disclosure only where the information is in a *different* form from what it was originally in. As an Amicus points out, "Congress could hardly have embarked on a more oblique route if its goal was to create such a separate requirement." *Brief of Amici Curiae Professor John L. Neufeld and The Freedom of Information Clearinghouse* at 4.

I do not accept the majority's characterization of our choice here as one between construing a statutory phrase as a meaningful requirement or ignoring the same words as meaningless surplusage. Rather, I see the choice as one between attributing weighty legal significance to a common and inherently vague [6] term that could be just as meaningfully viewed in context simply as a linguistic aide to the Amendment's main requirement of anonymity, and recognizing it for what it is, a transitional technique of drafting. Under either reading, the words make literal sense, and, functionally, the reading adopted in *Neufeld* and *Long* is far less eccentric. Thus, unless other indicia compel the result, the language itself does not, in my view, support the imposition of a distinct statutory requirement of reformulation.

But even if Congress *did* intend to create a reformulation requirement, I am at a loss to understand why the majority so conclusorily assumes that deletion of identifying information does not satisfy this requirement. Why is it a "curious usage" to say that a document takes a different form once deletions of key information have been made? In its original, it is in a form that identifies; once the necessary deletions are made, it is in a form that does not identify. In my view, the common understanding of keeping documents in anonymous form is satisfied once deletions of possibly identifying materials are made. Nothing in the statute indicates that Congress intended the word "form" to mean any more than this.[7]

---

**6.** Indeed, even the majority is unable to set forth a general test for when information is in a different form. Maj. op. at 160–63. All it is sure of is that deletion is not sufficient and aggregation is not necessary. Yet, somehow, the majority is able to "readily opine" from the purpose of its reformulation test, that mere copying in different language and style is not sufficient. Maj. op. at 163 n.5. The glaring deficiency with the majority's "reformulation" test is that it never specifies from *what* original form the reformulation must be done and just what satisfies the reformulation requirement. The majority refers to "some alteration by the government of the form in which the return information was originally recorded." *Id.* at

163. Yet the IRS obviously has information in its files in hundreds of different developmental stages. For example, notes of an investigation, abstracts of an investigation, list of investigations done in a week, etc. ... To say that there must be "reformulation" does not at all answer the question of what is an original form to begin with.

**7.** The fact that Senator Haskell specifically intended to allow disclosure of items such as the tax model strongly supports the *Neufeld* position that redaction is enough to take a document out of the "return information" classification. In reaching its original decision in this case, the majority erroneously assumed that the tax mod-

The majority also argues that it "would be most peculiar to catalogue in such detail, in subparagraph (A) of the body of the definition, the specific items that constitute 'return information' ... while leaving to an afterthought the major qualification that none of those items counts unless it identifies the taxpayer." Maj. op. at 157. Were the entire statute drafted at one time, there might be some merit in this argument. But, as I already pointed out and as the majority concedes, the Haskell Amendment was indeed an afterthought. It is certainly not unusual that a floor amendment makes a major change in the meaning of an original provision. The majority's insistence on stylistic congruity ignores the reality of the legislative process. Moreover, the panel opinion itself provides the justification for the list of specific kinds of material to be described as "return information," since it holds that items that do not appear in the list are to be treated no differently than any other item requested under FOIA.

The majority's efforts to show that the reading adopted by this court in *Neufeld v. IRS*, 646 F.2d 661 (D.C.Cir.1981), and by the Ninth Circuit in *Long v. IRS*, 596 F.2d 362 (9th Cir.1979), *cert. denied*, 446 U.S. 917, 100 S.Ct. 1851, 64 L.Ed.2d 271 (1980), creates pockets of superfluity is similarly unpersuasive. The tension described is actually created by the majority's insistence that the Haskell Amendment cannot be interpreted as making a few provisions of a large and complex statute internally redundant, although still functionally meaningful and consistent. The futility of relying so

heavily on the minor redundancies the Haskell Amendment effects in neighboring provisions that mention "return information" is demonstrated by the fact that even the majority's reading makes three such provisions superfluous. *See* § 6103(j)(4) ("return information" not to be released "except in a form which cannot be associated with, or otherwise identify ...); § 6103(i)(7)(A) (same); § 6108(c) (no disclosure shall be such as can be "associated with ..."). Recognizing the redundancy of these provisions, the majority finds it "remarkable that the dislocations are not greater," maj. op. at 163, and concludes that the superfluity inquiry demonstrates the propriety of its approach because the superfluity it causes is much less than that produced by the interpretation in *Long. Id.* Quantitatively, the majority is correct. Its approach wins 5–3. But qualitatively, the superfluity created by both readings of the Haskell Amendment are alike.[8] Neither affects any substantive, practical matter.

Given the unavoidable stylistic superfluity under either construction, I do not see how the redundancy issue can be used to carry the day for either side of the debate. Once it is recognized that any interpretation of the Haskell Amendment "dislocates" some provisions by making them technically unnecessary, I think it useless to award victory to the interpretation that affects the fewer number. The unavoidable conclusion to be drawn from the superfluity created by either construction is that Congress did not concern itself with the fact that some of the other provisions

---

el was a "partly actual, partly fictional return," and thus met its novel "reformulation requirement." Maj. op. at 163 (prior to amendment). Through a helpful post-decision motion filed by the American Civil Liberties Union of Washington, it has now come to light that, at the time of the Haskell Amendment, the tax model was in fact only "an actual return with identifying details eliminated." Maj. op., at 162 (as amended). *See* Motion of Amicus Curiae to Amend Opinion (filed June 10, 1986). Given this acknowledgement of its mistaken factual assumption, I am amazed that the majority continues to claim that redaction *is insufficient* under the Haskell Amendment. After having relied in the original opinion on the tax model to refute the government's suggestion that *aggregation* is required, the majority stubbornly refuses now to examine the effect that the newly discovered *definition* of the then existing tax

model has on its own standard of *reformulation.* The correct description of the tax model at the time of passage definitively demonstrates that both the interpretations advanced by the government and the majority are wrong, and that all that the framers of the Amendment thought necessary under § 6103 was effective redaction.

8. The majority argues that the score is in fact 9–2. Maj. op. at 158 n. 2. It supports this by counting § 6103 four separate times, by counting § 6103 twice, by discounting the relevance of § 6108(c), and by arguing that the phrase "in a form" is a flaw to be counted against the circuit's former construction, but not against its own construction. Leaving these accounting issues aside, the fact remains that under either tabulation, neither construction fits snugly with the rest of the statutory scheme.

were being made stylistically inelegant. Once that conclusion is reached, minor differences in how many provisions each construction affects become irrelevant.

### III.

Aside from its textual arguments, the majority urges that its reading is consistent with plausible legislative intent since any case-by-case assessment that data will not identify a taxpayer is problematic because it "depends to a large extent upon uninformed estimations as to what data the requester [already] possesses." Maj. op. at 158.

The problem of identification by an informed requester is not at all unique to the Internal Revenue Service. Exemption 4 of the FOIA, for example, exempts from disclosure material containing confidential, commercial information. 5 U.S.C. § 552(b)(4). Exemption 6 exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7 deals with law-enforcement investigatory information to the extent that it would "constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(c). All of these exemptions clearly implicate the "informed requester" problem, but the Act nonetheless provides that "[a]ny reasonable segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Courts have developed standards and procedures to deal with agency assertions that any disclosure might lead to the substantive harm described by FOIA, taking into account the informed requester issue. *See Dept. of Air Force v. Rose*, 425 U.S. 352, 380, 96 S.Ct. 1592, 1608, 48 L.Ed.2d 11 (1976) ("what constitutes identifying information regarding a subject cadet must be weighed not only from the viewpoint of the public, but also from the vantage of those who would have been familiar, as fellow cadets or Academy Staff, with other aspects of his career at the Academy"); *Halperin v. Central Intelligence Agency*, 629 F.2d 144, 150 (D.C.Cir.1980) (concluding that CIA was justified in not disclosing information since "[w]e must take into account ... that each

individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself") (quoted approvingly in S.Rep. No. 221, 98th Cong., 1st Sess. 27–28 (1983)); *Schonberger v. National Transportation Safety Board*, 508 F.Supp. 941, 945 (D.D.C.1981) ("the material cannot be redacted in a manner that would protect the identity of the individual whose privacy interest is at stake").

As the panel points out in describing the procedure for evaluating the disclosability of information which does not meet the definition of "return information," courts can, when appropriate, accept affidavits about classes of documents and information, as opposed to requiring document by document searches and Vaughn Indexes. Panel op. at 160–161. Of course, that approach entails some administrative effort, but administrative inconvenience alone has never been considered a sufficient reason for cutting back on FOIA. *See Long*, 596 F.2d at 367 (discussing amounts that some FOIA searches have cost but pointing out that Congress recognized that statute was an expensive one).

The majority argues, however, that while Congress was willing to tolerate the "risk of occasional unknowing disclosure" for FOIA disclosures in general, it was not willing to tolerate that risk for certain classes of information. Maj. op. at 158 (citing Central Intelligence Files). The CIA exemption teaches though, that Congress clearly know how to exclude certain classes of information from FOIA altogether when it wanted to. In the Central Intelligence File context it provided that "[o]perational files of the Central Intelligence Agency may be exempted by the Director of Central Intelligence from the provisions of [FOIA] which require publication or disclosure, or search or review in connection therewith." 50 U.S.C. § 431.

Indeed, the majority's conclusion that Congress sought to guard broadly against the "informed requester" phenomenon is undercut by the fact that, with regard to IRS written determinations (rulings, determination letters, or technical advice memoranda) and background files relating to written determinations, Congress explicitly provides for public inspection of the doc-

uments after *deletion* of the specific exempted data that is not to be disclosed. 26 U.S.C. § 6110. Section 6110 operates independently of FOIA, sets out its own exemptions and procedures, and is in many respects stricter. Yet Congress mandated disclosure after deletion of the nondisclosable material. Written determinations such as private letter rulings that describe the underlying facts of a case surely carry with them the same risk of taxpayer identification, yet Congress was satisfied with deletion.[9] There is, so far as I can tell, nothing to indicate that Congress wanted the informed requester problem treated differently when it comes to return information.[10]

Given my conclusion that items listed in § 6103(b)(2) that can be disclosed in a manner that does not identify a taxpayer are not "return information," and are therefore not wholly immune from FOIA disclosure,[11] I would subject such items to the same procedures as the panel provides for items not specifically listed in § 6103. *See* Panel op. at 153. If the Service determines that disclosure cannot be made without risk of identification, that factual assessment, of course, deserves considerable deference, dependent as it is on the agency's expertise in the area. *See Halperin v. Central Intelligence Agency*, 629 F.2d 144, 148 (D.C.Cir.1980).

The court today overreads an everyday casual phrase of no certain content to impose an important new and comprehensive restriction on disclosure of items listed in § 6103(b)(2), a requirement that does nothing in itself to advance the cause of taxpayer privacy. The majority adopts a "reformulation" test which Congress never intended, and which the majority itself is unable to define. In so doing, the court has misread the thrust of the Haskell Amendment and effectively emasculated its application. The court has, in the most classic sense, elevated "form" over substance.

I respectfully dissent.

---

**9.** The majority argues that the error of the *Long* construction is made "particularly clear" when compared with the detailed provisions set out in § 6110 for disclosure of written interpretation documents in which the public has an even stronger interest. The majority's point, however, applies equally to its own analysis of § 6103. Why, under its construction of § 6103 would Congress have permitted disclosure of reformulated, nonidentifying information without any of the safeguards of § 6110 (which itself applies to nonidentifying, and assumedly reformulated, information)? We all agree that § 6103, unlike § 6110, operates within the confines of FOIA, and does not provide for the extra safeguards listed in § 6110. *See* Panel op. at 148–150. The presence of a separate statutory scheme in § 6110 does not then help the majority at all in showing that Congress was not satisfied with FOIA-type redaction under § 6103.

**10.** In the course of the 1981 amendments to § 6103, Congress evinced an understanding of the scope of the Haskell Amendment, identical to the one adopted in *Long* and *Neufeld*. The Conference Report stated that:

> Present law restricts the disclosure of tax returns and return information. *However, information that cannot identify any particular taxpayer is not protected under the disclosure restrictions.*

H.R.Rep. No. 215, 97th Cong., 1st Sess. 264, *reprinted in* [1981] U.S. Code Cong. & Admin. News 105, 353 (emphasis added). While such subsequent legislative history is, of course, not dispositive, it shows minimally that this reading is *not* contrary to the intent of Congress.

**11.** Even information disclosable under § 6103 is, of course, still subject to possible exemption under one or more of the nine FOIA exemptions. 5 U.S.C. § 552(b).